UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MUHAMMAD A. AZIZ,

                 Plaintiff,

  – against –

UNITED STATES OF AMERICA,

                 Defendant.

Case No. 23-CV-8504

**COMPLAINT**

SHANIES LAW OFFICE LLC

David B. Shanies
Deborah I. Francois
Tristan M. Ellis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
tristan@shanieslaw.com

*Attorneys for Plaintiff Muhammad A. Aziz*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

NATURE OF THE ACTION ..............................................................................................3

JURISDICTION AND VENUE ..........................................................................................4

ADMINISTRATIVE EXHAUSTION .................................................................................4

PARTIES .............................................................................................................................4

FACTS .................................................................................................................................5

   A.  The Crime and Muhammad Aziz's Innocence .................................................5

   B.  The Investigation and Concealment of Exculpatory Information .....................7

   C.  The Arrest, Trial, and Conviction ..................................................................10

   D.  The Post-Conviction Proceedings and Discovery of Exculpatory Information
       Withheld from the Defense ..............................................................................15

      1.  Mujahid Abdul Halim's Affidavits .......................................................16

      2.  The Revelation of Eugene "Gene" Roberts's Identity and Some of His
          Knowledge ...............................................................................................17

      3.  The District Attorney's Opposition, Based on False Representations by FBI
          Employees, and the Trial Court's Decision ............................................18

   E.  The Joint Reinvestigation and Discovery of Additional Information Concealed by
       FBI Employees .................................................................................................20

   F.  The Joint Motion to Vacate and Trial Court's Decision .................................26

   G.  J. Edgar Hoover's and FBI Employees' Violation of Federal Laws and Internal
       Directives and Operating Procedures .............................................................27

   H.  The FBI's History of Spreading Disinformation, Withholding Exculpatory
       Information, and Fabricating Evidence ..........................................................33

      1.  J. Edgar Hoover's COINTELPRO ........................................................33

      2.  Case Studies of the FBI's Misconduct ..................................................36

DAMAGES ........................................................................................................................44

CAUSES OF ACTION.......................................................................................................46

FIRST CAUSE OF ACTION
Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680
New York State Law: Intentional Infliction of Emotional Distress .........................................46

SECOND CAUSE OF ACTION
Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680
New York State Law: Malicious Prosecution ..........................................................................48

THIRD CAUSE OF ACTION
Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680
New York State Law: Negligent Infliction of Emotional Distress...........................................50

FOURTH CAUSE OF ACTION
Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671–2680
New York State Law: Negligence .............................................................................................52

REQUEST FOR RELIEF ...........................................................................................................55

Plaintiff Muhammad A. Aziz, by his undersigned counsel, the Shanies Law Office LLC, as and for his complaint against the above-named Defendant, alleges as follows:

## INTRODUCTION

1.     Mr. Aziz brings this action under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346 and 2671-2680, seeking redress for damages caused by the tortious misconduct of United States government employees affiliated with the Federal Bureau of Investigation (the "FBI" or "Bureau"), an agency within the U.S. Department of Justice (the "DOJ"), and Mr. Aziz's resulting unjust prosecution, conviction, decades of incarceration, and decades more of being falsely marked as the murderer of a prominent civil rights leader.

2.     The FBI and its employees, including former FBI Director J. Edgar Hoover, caused Mr. Aziz to be wrongfully prosecuted, convicted, and imprisoned for more than 20 years for one of the most infamous murders in American history: the 1965 assassination of El-Hajj Malik El-Shabazz, also known as Malcolm X—a crime of which Mr. Aziz was innocent.

3.     FBI employees, including Hoover, intentionally caused the presentation of false evidence against Mr. Aziz, concealed a trove of evidence of Mr. Aziz's innocence, and orchestrated fundamentally unfair legal proceedings against Mr. Aziz, despite knowing that their acts and omissions would violate Mr. Aziz's legal rights and cause him severe damage.

4.     Mr. Aziz, a United States Navy veteran who served multiple tours of duty, and the father of six young children, was only 26 years old when he was arrested for Malcolm X's murder. He spent 20 years, during what should have been the prime of his life, locked in prison for a crime he did not commit.  The damage done to Mr. Aziz and his family was immense and irreparable.

5.     Mr. Aziz was exonerated over 55 years later in November 2021 after his attorneys, the Shanies Law Office and the Innocence Project, working cooperatively with the New York County District Attorney's Office's (the "District Attorney") Conviction Integrity Program,

1

completed a two-year reinvestigation that conclusively demonstrated Mr. Aziz and his co-defendant Khalil Islam[1] were wrongfully convicted.

6.      The reinvestigation revealed, among other things, that Mr. Aziz's wrongful conviction was the product of corruption and misconduct by numerous FBI employees, including Hoover.

7.      During the November 18, 2021, hearing on a motion to vacate the convictions and dismiss all charges, then-District Attorney Cyrus R. Vance, Jr. acknowledged publicly that FBI employees and the NYPD repeatedly and intentionally concealed evidence of Mr. Aziz's innocence—the first time any public official formally acknowledged the FBI's misconduct:

> [W]hat we have obtained in this reinvestigation now are new materials that our office tragically did not have in 1965 and, thus, did not turn over to the defense.  Most critically, we have obtained dozens and dozens of reports from the FBI and the NYPD Bureau of Special Services Investigations.
>
> These records include FBI reports of witnesses who failed to identify Mr. Islam and implicated other subjects and suspects, and significantly, we now have reports that the late FBI Director J. Edgar Hoover, himself, and the FBI, ordered multiple witnesses not to tell police or prosecutors that they were, in fact, FBI informants.  Many of those documents were exculpatory.  None of them were disclosed to the defense.

8.      That misconduct led District Attorney Vance to "apologize for what were serious, unacceptable violations of law and the public trust."

9.      During the hearing, District Attorney Vance stated that "there is only one ultimate conclusion; Mr. Aziz and Mr. Islam were wrongfully convicted of this crime."

10.      To this day, the FBI has never acknowledged, much less apologized for, its role in causing Mr. Aziz and Mr. Islam to spend decades in prison for a crime they did not commit.

---

1.   Khalil Islam was named in the indictment as Thomas Johnson and Thomas 15X Johnson, and Mr. Aziz was named in the indictment as Norman Butler and Norman 3X Butler.

2

11.     The state court judge who granted the motion and dismissed the charges remarked, "I regret that this Court cannot fully undo the serious miscarriages of justice in this case and give you back the many years that were lost.  Dismissal of the indictment is the full extent of this Court's authority."

12.     As a result of his wrongful conviction and imprisonment, Mr. Aziz spent 20 years in prison for a crime he did not commit and more than 55 years living with the hardship and indignity attendant to being unjustly branded as a convicted murderer of one of the most important civil rights leaders in history.

13.     Mr. Aziz now seeks redress under the FTCA, based upon violations of New York state law, for the official misconduct that caused his wrongful conviction and imprisonment and the mental and physical injuries he sustained while incarcerated.

## NATURE OF THE ACTION

14.     This is an action brought pursuant to the FTCA to recover compensatory damages for the extreme and outrageous tortious acts and omissions of employees of the FBI during and after the investigation into the murder of Malcolm X.  From 1965 to 2021, numerous FBI employees committed torts cognizable under New York law, *see* 28 U.S.C. §§ 1346(b)(1) and 2674, by working in concert with the NYPD and others to fabricate evidence used to secure Mr. Aziz's wrongful conviction, and by intentionally concealing—and even denying the existence of—information that would have exonerated Mr. Aziz and allowed the men who actually killed Malcolm X to be held accountable.  FBI employees concealed this information for the purposes of, *inter alia*, protecting and concealing the scope, nature, and activities of its domestic "Counterintelligence Program," also called "COINTELPRO," and to divert blame from individuals whom certain FBI employees did not want to see prosecuted for their crimes.  The United States is responsible for the tortious conduct of its FBI employees, including Hoover.

3

## JURISDICTION AND VENUE

15.     This Court has original subject matter jurisdiction over Mr. Aziz's FTCA claims pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1).

16.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1402(b) because a substantial part of the acts or omissions giving rise to Mr. Aziz's claims occurred in this District.

## ADMINISTRATIVE EXHAUSTION

17.     Pursuant to 28 U.S.C. §§ 2401(b) and 2672, Mr. Aziz properly filed an administrative claim with the Federal Tort Claims Act Section of the DOJ, the agency of which the FBI is a part, and with the FBI directly, in March 2023.  On June 14, 2023, the DOJ confirmed that it had received Mr. Aziz's claim.  Since that time, the DOJ has not tried to resolve the claim.

18.     Six months have since passed from the claim's presentation to the United States. Mr. Aziz deems the agencies' failure to render a final disposition of his claim a constructive denial pursuant to 28 U.S.C. § 2675(a).   Accordingly, Mr. Aziz has exhausted his administrative remedies.

## PARTIES

19.     Plaintiff Muhammad A. Aziz is a citizen of the United States and was, prior to his incarceration, a resident of Bronx County in the City and State of New York.  He is 85 years old.

20.     Defendant the United States of America is the appropriate defendant under the FTCA.

21.     The federal officers referenced in this complaint were at all relevant times employees, officers, and/or agents of the United States, acting within the scope and course of their employment with the FBI, an agency of the United States.

## FACTS

### A.    The Crime and Muhammad Aziz's Innocence

22.    On February 21, 1965, at approximately 3:00 p.m., Malcolm X was introduced to speak at the Audubon Ballroom in Manhattan, New York.  At the time, Mr. Aziz was at his home in the Bronx.

23.    As Malcolm X began his remarks, a group of men in the audience orchestrated a distraction by pretending to fight over a pickpocketing attempt and throwing an improvised smoke bomb into the crowd.

24.    Amid the resulting confusion, three men ambushed Malcolm X, shooting and fatally wounding him.

25.    First, William Bradley,[2] a former Lieutenant in the Nation of Islam (the "NOI") Mosque No. 25 in Newark, New Jersey, shot Malcolm X with a sawed-off, 12-gauge shotgun.

26.    Shortly thereafter, two former members of NOI Mosque No. 76 in Paterson, New Jersey—Mujahid Abdul Halim,[3] who fired a .45 caliber semiautomatic pistol, and Leon Davis, who fired a 9mm semiautomatic pistol—shot Malcolm X repeatedly as he lay prone on the stage.

27.    All three gunmen fled, but Halim was captured at the scene by a group of civilians and arrested by the NYPD.  All three gunmen dropped their guns inside the Audubon Ballroom.

28.    Co-conspirators Benjamin Thomas, a former Assistant Secretary of Mosque No. 76 in Paterson, New Jersey, and a man known as Wilbur Kinly, a former member of Mosque No. 25 in Newark, New Jersey, were also present.  One or both of those men created the distraction in the

---

2.    William Bradley was later known as Al-Mustafa Shabazz.

3.    Mujahid Abdul Halim was alternatively known as Talmadge Hayer, Thomas Hayer, Thomas Hagan, and Thomas Hagen.

crowd to divert attention from the shooters, and Kinly threw onto the Ballroom floor an improvised smoke bomb made by Halim.

29.     An FBI informant named Ronald Timberlake recovered the .45 caliber pistol that Halim fired at Malcolm X.  Timberlake took the murder weapon back to his home in Brooklyn, New York, and disassembled it.  Later that day, Timberlake contacted the New York Field Office of the FBI and arranged to deliver the gun to the FBI.  FBI employees took possession of the murder weapon.  FBI employees later delivered the murder weapon to the NYPD.

30.     The shotgun and 9mm semiautomatic pistol used by the two other gunmen were retrieved by a man named Charles Blackwell.  Blackwell later testified before the grand jury that he wrapped the guns in coats and gave them to Reuben Francis and "Brother [Gene]," although he testified differently at trial.

31.     At the time of the attack on Malcolm X, Mr. Aziz was at his home at 661 Rosedale Avenue, Bronx, New York.  He had nothing whatsoever to do with the crime.

32.     Mr. Aziz spent most of that day tending to his legs, which had been wounded in a beating a month prior by police officers.

33.     At the time of Malcolm X's murder, the injuries to his legs prevented Mr. Aziz from being able to run or even walk without limping and substantial pain.

34.     As evidenced by hospital records, Mr. Aziz went to Jacobi Hospital on the morning of February 21st due to pain in his right leg and was treated in the emergency room.  The attending physician, Dr. Kenneth Seslowe, M.D., wrapped Mr. Aziz's wounded leg, prescribed medication, and instructed him to elevate and rest his leg.

35.     Mr. Aziz returned to his home in the Bronx sometime before 1:00 p.m. and remained there for the rest of the day, resting his leg as the doctor had instructed.

36.     While at home with his family, Mr. Aziz had a series of telephone calls at or around 3:00 p.m. about the recently announced news of Malcolm X's shooting.  This included incoming calls from Gloria Wills and Juanita Gibbs, friends of Mr. Aziz's then-wife.  Both women spoke to Mr. Aziz and therefore were able to confirm that he was at his home in the Bronx at the time of the crime.

37.     In addition, Mr. Aziz exchanged calls with Mosque No. 7 in Manhattan shortly after hearing news of the shooting at the Audubon Ballroom.  Among those calls, J.M., a former member of Mosque No. 7, called Mr. Aziz at his home and spoke to him, thereby confirming that Mr. Aziz was at his home in the Bronx at the time of the crime.

### B.     The Investigation and Concealment of Exculpatory Information

38.     Numerous FBI employees immediately undertook a significant role in the investigation of Malcolm X's murder.  Numerous FBI employees worked cooperatively with the NYPD and the District Attorney in the investigation and prosecution of the criminal case.

39.     The majority of the investigation occurred in the Eastern and Southern Districts of New York, but it extended into other states, including Massachusetts, Illinois, Pennsylvania, and New Jersey.

40.     FBI employees and NYPD investigators worked in close cooperation throughout the investigation and prosecution of the case, and the agencies extensively shared information and resources.

41.     For example, numerous eyewitnesses, both testifying and non-testifying, were FBI informants who were sent to the NYPD by their FBI contacts.  FBI employees orchestrated and supervised FBI informants' communications with the NYPD.

42.     FBI employees likewise coordinated Ronald Timberlake's cooperation with the NYPD, leading to the recovery of one of the murder weapons in Brooklyn.  An FBI employee

delivered the murder weapon to the NYPD along with Timberlake, and both the employee and Timberlake later testified at trial.

43.     The FBI and the NYPD established a liaison system of higher-ranking officers to exchange information.  Early in the investigation, the FBI invited the NYPD's collaboration on developing investigative leads outside of New York.

44.     The FBI provided the NYPD with the identities of individuals its employees identified as having been present in the Audubon Ballroom at the time of the murder.  FBI employees interviewed witnesses and prepared them for meetings with prosecutors.  Both the FBI and the NYPD, at each other's requests, conducted research and shared information about persons of interest, including at least three of the five known assassins (Bradley, Davis, and Halim).

45.     FBI employees made the Bureau's crime laboratory available for the NYPD's use during the investigation and processed fingerprints recovered during the investigation.

46.     Throughout the investigation, FBI employees and NYPD amassed an immense volume of intelligence and investigative reports pointing away from Mr. Aziz and demonstrating that the actual perpetrators came from New Jersey and were affiliated with the NOI mosques in Newark and Paterson, New Jersey.

47.     FBI employees likewise obtained detailed descriptions of two suspects, including the shotgun assassin later falsely identified as Mr. Islam, who was described as "a negro male, age twenty eight, six feet two inches, two hundred pounds, heavy build, dark complexion, wearing [a] gray coat and believed to be [the] assailant who used [the] shotgun."  That description matched Bradley and was nothing like Mr. Islam.

48.     Over the next few weeks, FBI employees became aware of another informant who corroborated the previously obtained description of the shotgun assassin.  A Boston-based FBI

informant shared with the FBI a physical description of the assailant with the shotgun, the assailant's connection to the Newark mosque, and the fact that the assailant appeared to be an "expert" in handling a shotgun.

49.     FBI employees maintained an extensive file on Bradley and knew he was dark-skinned, heavy-set, a former lieutenant in the Newark mosque, and experienced with firearms.

50.     Hoover expressly instructed the Bureau not to disclose to the NYPD the descriptions implicating Bradley.

51.     All the FBI employees involved in the investigation concealed that information from both the NYPD and the District Attorney.

52.     Intelligence that FBI employees collected included the names of all three shooters (Bradley, Davis, and Halim) and co-conspirator Thomas, the specific locations where the men were sitting in the Ballroom, and physical descriptions of the assassins.

53.     Numerous FBI and NYPD informants and undercover officers witnessed the murder of Malcolm X.  That included Eugene "Gene" Roberts, who was at the time posing as a security guard for Malcolm X, while secretly working as an undercover officer for the NYPD's intelligence unit, the Bureau of Special Services and Investigations ("BOSSI").

54.     As a member of the rostrum security team on the day of Malcolm's murder, Roberts observed two of the shooters seated in the front row of the Audubon Ballroom and saw the three shooters run in the same direction, toward the back of the Ballroom.  Two of the shooters ran past Roberts, and Roberts physically engaged the third (Halim).

55.     In addition to Roberts's observations, FBI employees and the NYPD had intelligence from other sources that placed the shooters in the front row of the Audubon Ballroom.

56.     Despite being aware of the significant exculpatory value of the information described above, FBI employees involved in the investigation and criminal prosecution deliberately concealed this information from the District Attorney, the court, Mr. Aziz, and Mr. Islam.  In some instances, despite their supposed investigative partnership, the FBI knowingly and intentionally concealed exculpatory information even from the NYPD.

57.     FBI employees conducted the investigation with the NYPD under the hypothesis that the perpetrators were Black men associated with the NOI.

58.     Mr. Aziz and Mr. Islam made attractive targets to certain FBI employees and NYPD because both were known to law enforcement as Black men associated with the NOI; both were officers in NOI Mosque No. 7; and both were at home with their families at the time of the murder, as opposed to at the crowded Mosque No. 7 with many more potential alibi witnesses.  In addition, the FBI preferred the prosecution of Mr. Aziz and Mr. Islam to that of Bradley, who was known to the Bureau and evidently had an ongoing relationship with it.

59.     By concealing the exculpatory information that they collected during the course of their investigation, FBI employees successfully prevented disclosure of their investigative tactics and sources.

**C.     The Arrest, Trial, and Conviction**

60.     On February 26, 1965, the NYPD arrested Mr. Aziz at his home for the murder of Malcolm X.  By that time, the FBI had already begun amassing information pointing away from Mr. Aziz as the perpetrator.  Indeed, a February 22, 1965, FBI report provided detailed information about Malcolm X's murderers, including but not limited to a physical description of one of the assassins and the location of the assassins in the Audubon Ballroom.

61.     Subsequently, Mr. Aziz was tried in the Criminal Term of the Supreme Court of the State of New York, County of New York.

62.     The FBI and NYPD cooperated with each other in furnishing evidence to the prosecution for use in the trial.

63.     The District Attorney heaped praise on the FBI, in particular, for its "cooperation from the beginning of [the] case," calling it "terrific," "wonderful," and "a perfect example of real effective cooperation."   The trial prosecutor thanked the FBI's New York Field Office "for its assistance during the State's investigation of the case."   The FBI, for its part, noted that "Bureau Agents have played a very significant part in aiding local authorities in the prosecution of the defendants in this case."

64.     At trial, Mr. Aziz testified in his defense, affirming that he was innocent and was at home with his family at the time of the crime.  He further testified that he was in no way involved in the assassination, that he was not at the Audubon Ballroom on February 21, 1965, and that he had never in his life seen Halim prior to his arrest.

65.     Mr. Aziz also presented testimony from his wife and friends who either saw or called him at his home around the time of the murder.

66.     Mr. Aziz presented testimony from the physician who treated him in the emergency room for leg injuries on the morning of February 21st.

67.     Additionally, Mr. Aziz presented testimony from Ernest Greene, a young man from Queens who witnessed the shooting and saw the shotgun assassin, whom he described as "stout and very dark and had a very deep beard"—an accurate description of William Bradley, not Mr. Islam (nor, for that matter, Mr. Aziz).

68.     The trial prosecutor would later comment on the stark difference between Mr. Greene's description of the shotgun assassin and Mr. Islam's physical appearance, wryly implying that the incongruity indicated Mr. Greene's testimony was contrived: "Stout and very dark and had

a very deep beard.  Well, I guess that's about the best description you could get and keep it away from the defendant [Mr. Islam]."

69.     Finally, following earlier testimony in which he denied guilt, Halim insisted on returning to the stand and testifying for Mr. Aziz.  Halim recanted his previous testimony, confessed his guilt, and affirmed the innocence of his two co-defendants, Mr. Aziz and Mr. Islam. Upon retaking the stand, Halim testified that he was speaking of his own free will because "I just want to tell the truth, that's all."

70.     Halim testified that he did not know Mr. Aziz or Mr. Islam before they became his co-defendants, and that neither of them had any involvement with the murder of Malcolm X.

71.     Halim admitted that he shot Malcolm X with a .45 caliber handgun.

72.     Halim testified that four other men were involved in the murder, that he knew all of them, and that he refused to identify them.

73.     Halim testified that he and another man sat in the front row armed with pistols, that another man sat a few rows back "with the shotgun," and that a "man in the back" started a "commotion" by pretending his pocket was being picked.

74.     Halim described the shotgun assassin as "husky" with "dark skin" and a beard— again, an accurate description of William Bradley, not Mr. Islam or Mr. Aziz.  Halim refused to describe the other co-conspirators.

75.     Numerous FBI employees possessed information and evidence corroborating this testimony by Halim, along with other exculpatory information.

76.     There is not and never was any physical or forensic evidence linking Mr. Aziz to the shooting.  Nor was there any evidence of Mr. Aziz having any connection to Halim, or even

having ever met him.  Nor was Mr. Aziz seen anywhere near the crime scene on the day of the February 21st.

77.     The prosecution's case against Mr. Aziz rested entirely on eyewtiness testimony, many relevant portions of which FBI employees were involved in procuring and directing.

78.     Numerous FBI employees participated in the fabrication of evidence by causing witnesses to give false and materially misleading statements to prosecutors and in their sworn testimony.

79.     Absent the fabricated testimony, Mr. Aziz would not have been prosecuted, must less convicted, for the murder of Malcolm X.

80.     Had FBI employees divulged to the defense, the court, the prosecution, and/or the NYPD evidence they possessed of Mr. Aziz's innocence and other individuals' guilt, Mr. Aziz would not have been prosecuted, must less convicted, for the murder of Malcolm X.

81.     FBI employees helped secure Mr. Aziz's wrongful conviction by knowingly and intentionally facilitating the fabrication of evidence against Mr. Aziz and concealing evidence of his innocence.

82.     Various witnesses prepared by the FBI purported to place the shooters of Malcolm X in different parts of the Audubon Ballroom, but none of them placed the shooters in the front row.  The only trial witness who testified that the shooters sat in the front row was Halim.

83.     Numerous FBI employees possessed information and evidence corroborating this testimony by Halim, along with other exculpatory information.

84.     Indeed, at the time of trial, the FBI and its employees possessed a tremendous amount of evidence indicating that Mr. Aziz was innocent and pointing to the actual perpetrators.

85.     The evidence that the FBI concealed includes, but is not limited to:

a. An FBI report dated February 22, 1965, stating that "the killers of Malcolm X were possibly imported to NYC" and that the shooters sat in the front seats of the Audubon Ballroom, and providing detailed descriptions of two suspects;

b. An FBI report dated February 25, 1965, indicating that, at then-Director J. Edgar Hoover's behest, local FBI offices were instructed not to disclose to the NYPD the FBI informant status of any witness in the murder investigation;

c. An FBI report dated March 4, 1965, containing information about a known associate of Halim's nicknamed "Turk," noting, *inter alia*, that "Turk" was believed to be Leon Davis—the man now known to have shot Malcolm X with a 9mm semiautomatic handgun, *i.e.*, the conduct attributed to Mr. Aziz in the criminal case;

d. A police report dated March 8, 1965, with information from an eyewitness to the murder, describing the shooters as men from the Nation of Islam and based in New Jersey who sat in the front row on the left-hand side, with "Benjamin from Paterson or Newark" seated two rows behind them—precisely matching Halim's description of himself, Leon Davis, and Benjamin Thomas;

e. An FBI report dated March 25, 1965, summarizing intelligence that one of the shooters came from Newark, New Jersey;

f. An FBI dossier on William Bradley, containing detailed information collected between 1963 and 1965, demonstrating clear links between Bradley and Malcolm X's murder;

g. An April 13, 1965, memorandum from Hoover to the Special Agent in Charge of the New York Field Office, instructing that the FBI's intelligence implicating "a lieutenant from the Newark Temple of the Nation of Islam"—referring to Bradley—must "not be furnished to the [NYPD] without first receiving Bureau authority"; and

h. Numerous reports from Eugene Roberts—an undercover NYPD officer working for BOSSI—corroborating Halim's account of the murder and undermining the testimony of every prosecution witness, including but not limited to reports that the shooters sat in the front row of the Audubon Ballroom.

86.    The FBI employees who possessed this evidence were obligated—under the FBI's policies and otherwise—to reveal it to the prosecutor in the case, and ultimately to Mr. Aziz and his counsel.  They never did.  Instead, the FBI employees intentionally hid this evidence from Mr.

Aziz; Mr. Islam; their representatives; the court; in many cases, the prosecution; and, in some cases, even from its investigative partner, the NYPD.

87.     The FBI employees who concealed this evidence knew, intended, were recklessly indifferent to the fact, and/or negligently disregarded the fact that, by virtue of their roles in the investigation and prosecution of the case, they were the only persons in a position to inform prosecutors, the court, and/or the individuals charged with crimes of the evidence of Mr. Aziz's innocence.

88.     Absent FBI employees' concealment of evidence of his innocence, Mr. Aziz would not have been prosecuted, must less convicted, for the murder of Malcolm X.

89.     At the end of the trial, Mr. Aziz was wrongfully convicted of first degree murder.

90.     The judgment of conviction was entered under Indictment No. 871/1965.

91.     On April 14, 1966, the trial court sentenced Mr. Aziz to life imprisonment.  He began serving the sentence immediately.

### D.      The Post-Conviction Proceedings and Discovery of Exculpatory Information Withheld from the Defense

92.     Over the course of years and eventually decades, FBI employees prolonged Mr. Aziz's incarceration by continuing to conceal evidence of his innocence and by lying about the evidence they had.

93.     After his unsuccessful direct appeal, Mr. Aziz moved in December 1977 to vacate his conviction, primarily on the grounds of newly discovered evidence under Section 440.10(1)(g) of the New York Criminal Procedure Law (the "1977 440 Motion").

94.     The 1977 440 Motion was predicated on, *inter alia*: (1) affidavits from Halim, identifying his true co-conspirators and providing additional information about the murder; (2) certain redacted FBI records that the FBI had concealed at the time of trial but that Mr. Aziz

obtained during the pendency of the post-conviction proceedings; and (3) the revelation that undercover detective Eugene Roberts had witnessed Malcolm X's assassination.

95.     At the time of Mr. Aziz's 1977 440 Motion, not only did the FBI continue to hide the substantial amount of evidence it possessed, but FBI employees, including Special Agent Steven Edwards, took affirmative steps to lie to the District Attorney about the evidence it possessed.

96.      Central to both the District Attorney's opposition to Mr. Aziz's post-conviction motion *and* the court's decision to deny the motion without a hearing were assurances by FBI employees, including then-Agent Steven Edwards, that the Bureau's thorough investigation never revealed any information about the men Halim named as his co-conspirators.

97.     That fateful lie dashed any chance of clearing Mr. Aziz's name.

### 1. *Mujahid Abdul Halim's Affidavits*

98.     In his affidavits dated November 30, 1977, and February 25, 1978, Halim identified his fellow assassins as Benjamin Thomas, Leon Davis, "William X,"[4] and "Wilbur or Kinly."

99.     Halim averred that all four men were NOI members from New Jersey.  Thomas and Davis—both of whom Halim knew "well"—lived in Paterson and were associated with Mosque No. 76 in Paterson.  "William X" and "Wilbur" both lived in Newark and were associated with Mosque No. 25 in Newark.

100.     Halim described in detail the murder plot, his recruitment to the plot, the planning of the murder, and each assassin's role.  Halim explained that he and Davis sat in the front row of the Audubon Ballroom, with Bradley and Thomas sitting close behind them and Kinly in the rear of the Ballroom.

---

4.   By the time Mr. Aziz filed a petition on or around December 31, 1979, for a writ of habeas corpus, William X's last name was identified as "Bradley."

101.    FBI employees continued to conceal, and lie about the existence of, a large volume of the FBI's and other law enforcement agencies' documents and information corroborating many details set forth in Halim's affidavits.

### 2. The Revelation of Eugene "Gene" Roberts's Identity and Some of His Knowledge

102.    Roberts's identity as an undercover NYPD officer and the fact that he witnessed Malcolm X's murder were first publicly revealed during his testimony in an unrelated criminal case—the so-called "Panther 21" case—in 1970.

103.    When questioned during the "Panther 21" trial about Malcolm X's murder, Roberts testified that he was working undercover as a member of Malcolm's "rostrum security" and was relieved from his post just before Malcolm took the stage.

104.    Roberts testified that "two individuals near the front of the auditorium jumped up" to create the distraction, and as Roberts "started down the aisle" toward them, gunfire erupted. Roberts further testified that he came face to face with Halim, who shot at him but missed, and that he hit Halim with a chair, knocking him down.

105.    In response to Mr. Aziz's 1977 440 Motion, in January 1978, Roberts provided an affidavit, submitted by the District Attorney, denying his involvement in Malcolm X's assassination and averring that he did "not have any information" or reason to believe Mr. Aziz was innocent.

106.    Among other information that Roberts and the NYPD concealed at that time was that Roberts saw the shooters seated in the *front row* of the Audubon Ballroom, a crucial detail that corroborated Halim's account and contradicted those of the prosecution's witnesses.

### 3. *The District Attorney's Opposition, Based on False Representations by FBI Employees, and the Trial Court's Decision*

107.   FBI employees' continued concealment of evidence of Mr. Aziz's innocence continued throughout the course of Mr. Aziz's post-conviction proceedings and played a central role in the District Attorney's opposition to Mr. Aziz's motion.

108.   In opposing the 1977 440 Motion, the District Attorney represented to the court that "[t]he District Attorney's Office case file contains nothing which supports any of the defendant's allegations or contentions.  Specifically, there is no mention or indication of, or reference to, any of the persons identified by [Halim] in his affidavits as having been his accomplices in the murder of Malcolm X."

109.   The District Attorney informed the court that "[t]he District Attorney's Office case file contains no papers of any kind from the Federal Bureau of Investigation," and that "[i]n order to obtain unredacted copies of the FBI documents submitted by [defense counsel] in support of the instant motion, I have spoken with FBI Agent Steven Edwards."

110.   Relying on representations from then-FBI Agent Edwards and other FBI employees, the District Attorney further told the court that any information in the FBI records obtained by the defense had no significance:

> There is nothing in any of these unredacted FBI documents which in any way supports any of the defendants' contentions or allegations.  Specifically, *there is no mention or indication of the name of, or reference to, any of the persons identified by* [Halim] in his affidavits as having been his accomplices in the murder of Malcolm X.

111.   Finally, the District Attorney reported that FBI employees refused to provide additional FBI documents to the District Attorney:

> I am informed by [FBI Agent] Edwards that the FBI documents he has not provided me with in their unredacted form are not on file in the New York Office of the FBI.  [FBI Agent] Edwards informs me

that these documents are on file at the FBI's headquarters in Washington, D.C., but that because of the volume of papers on file at FBI headquarters it would take a considerable period of time to obtain them. . . .

*There appears to be nothing in any of these redacted documents which corroborates the allegations in* [*Halim's*] *affidavits, or which is otherwise supportive of the instant motion.* Many of these redacted documents are, [FBI Agent] Edwards informs me, internal FBI memoranda which merely summarize and chronicle the New York City Police Department's investigation into the murder, *and which contain no original information developed by the FBI.* Others of these documents contain information developed by the FBI which paralleled information obtained by the New York City Police Department.

112.     During the 2020 joint reinvestigation of the case, it was revealed that the above representations made by FBI employees to the District Attorney and the court were false. The FBI's files did, in fact, contain voluminous information, including information known only to the FBI, that supported Halim's account and Mr. Aziz's 1977 440 Motion.

113.     In a decision dated November 1, 1978, Justice Harold Rothwax denied the 1977 440 Motion.

114.     Justice Rothwax wrote that he "must question the reliability of any identification which comes thirteen years after the events in question to inculpate persons *who apparently were never the object of suspicion despite the thorough efforts of* local, state and *federal law enforcement officials*."

115.     He rejected Mr. Aziz's request for an order requiring the District Attorney to investigate, adding:

The district attorney has an obligation to the fair administration of public justice independent of the authority of this court. His is the prosecutorial discretion . . . . Were there reliable evidence which tended to support the conclusions that petitioners suggest, this court is confident that the district attorney would undertake to ensure that no miscarriage of justice had occurred.

19

116.    Mr. Aziz's petition for leave to appeal to the Appellate Division was denied.

117.    Following this denial, Mr. Aziz filed a petition for a writ of habeas corpus on or around December 31, 1979, in the United States District Court for the Southern District of New York.

118.    The petition included additional details from Halim about his co-conspirators' physical descriptions and noted that "William X," whose last name was by then identified as "Bradley," was "known as a stick-up man."

119.    The district court denied and dismissed the petition on December 31, 1980.

120.    Throughout those proceedings, FBI employees continued to conceal substantial evidence in their possession of Mr. Aziz's innocence, eliminating any chance for Mr. Aziz to have a fair shot at clearing his name.

121.    Mr. Aziz was ultimately granted parole and released from prison in 1985.  At that point, he had been wrongfully imprisoned for over 20 years.  Following his release, he spent an additional 35 years living under the shadow of his false conviction and bearing the label of Malcolm X's murderer.

### E.    The Joint Reinvestigation and Discovery of Additional Information Concealed by FBI Employees

122.    In January 2020, counsel for Mr. Aziz and Mr. Islam began a joint reinvestigation of the case with the District Attorney's Conviction Integrity Program.

123.    The reinvestigation unearthed substantial and compelling new evidence of Mr. Aziz's and Mr. Islam's innocence.

124.    This included, *inter alia*, information about Halim and his co-conspirators; information about FBI and NYPD informants and undercover officers who witnessed the murder;

information undermining the trial testimony of prosecution witnesses; and information corroborating Mr. Aziz's alibi.

125.   Numerous FBI employees had been in possession of a significant portion of the new evidence since soon after Malcolm X's assassination and well in advance of trial but had intentionally and continuously concealed that evidence from Mr. Aziz and Mr. Islam, including at the time of their trial, their convictions, their appeals, and their 1970s post-conviction proceedings.

126.   As the District Attorney observed, FBI documents themselves indicate that exculpatory information was "deliberately withheld," including from the District Attorney.

127.   Among the newly discovered evidence that FBI employees had concealed was the fact that there were at least ten FBI informants and sources present in the Audubon Ballroom when Malcolm X was assassinated.

128.   The reinvestigation also exposed the fact that FBI employees worked with NYPD investigators to coordinate the testimony of some FBI informants present for the murder.

129.   Other newly discovered evidence included numerous witness statements indicating that the real killers were from an NOI mosque in Newark, New Jersey (the same mosque attended by the now-known killers), and not New York City—a statement the FBI found to be accurate.

130.   For example, within 24 hours of the murder, FBI employees had collected intelligence indicating that "the killers" may have been "imported to NYC."

131.   In the weeks that followed, FBI employees obtained additional intelligence confirming the assailants' ties to New Jersey, including from a Boston-based informant who informed the FBI that the assailant wielding the shotgun was "a lieutenant in the Newark Temple." The informant further reported to FBI employees that "the man who started the distraction by

claiming someone's hand was in his pocket" was also understood to be "a member of the Newark Temple."

132.    The FBI hid yet more information about Halim's co-conspirators.  For example, the FBI had within a day of the murder a detailed physical description of the shotgun assailant, who was described as "a negro male, age twenty eight, six feet two inches, two hundred pounds, heavy build, dark complexion, wearing [a] gray coat and believed to be [the] assailant who used [the] shotgun."

133.    The same Boston-based informant who provided intelligence about the assailants' connections to New Jersey also reported to the FBI that the shotgun assailant was "a tall, dark skinned" Black man recognized as "a lieutenant in the Newark Temple" who "shot from the hip and appeared to be an expert in the handling of this type of gun."

134.    Notwithstanding the significance of these descriptions of the shotgun assailant, including their match to Bradley's physical appearance, several newly discovered FBI reports indicate that then-Director Hoover expressly instructed FBI employees to conceal this information from the NYPD and prosecutors.

135.    Notably, the physical descriptions of the shotgun assassin were nothing like Mr. Islam, who was falsely identified as the shotgun assassin, and who had an average build and very light skin.  Instead, the descriptions matched both Bradley's appearance and the trial testimony of defense witness Ernest Greene, whose description of the shotgun assailant as dark skinned, heavy-set, and bearded the prosecutor ridiculed for its contrast with Mr. Islam's appearance.

136.    Numerous FBI employees were well aware of the match between these descriptions of the shotgun assailant and Bradley, given that the FBI had been investigating Bradley for years and had compiled a detailed dossier on him—yet another fact that FBI employees long concealed.

The FBI had prepared its file on Bradley between 1963 and 1965, with all relevant entries pre-dating Mr. Aziz's trial.  The FBI file, prepared by Special Agent Dale R. Sutton, described Bradley as a Black man, twenty-seven years old at the time of the murder, 5'10" tall, 197 pounds, "stocky," with a "dark brown" complexion.  It also stated, *inter alia*, that: (1) he had been a lieutenant of the Newark mosque, (2) he was known as a "strong-arm" man for the NOI, (3) he had a history of violence, and (4) he was a former Marine trained in firearms.  The file also noted that the FBI possessed photographs of Bradley.

137.    Collectively, the FBI's intelligence, as set forth in its dossier on Bradley, provided ample corroboration of Halim's testimony and post-conviction affidavits about the shotgun assassin, as well as of defense witness Greene's testimony.

138.    FBI employees participating in the investigation and prosecution of the criminal case never revealed to their NYPD counterparts or prosecutors the significant intelligence they had about Bradley.

139.    During the investigation in 1965, FBI Special Agent August ("Gus") J. Micek, who served as the FBI's liaison to BOSSI, searched BOSSI's files and the records of the NYPD's Bureau of Criminal Identification to determine what information, if any, the NYPD had regarding Bradley.

140.    Micek ultimately confirmed that the NYPD had no information about Bradley.

141.    The exact nature of Bradley's relationship with the FBI is unclear and will be a subject of discovery in this case.  There is, however, evidence of a significant ongoing relationship between Bradley and the FBI.

142.    For example, four years after the murder of Malcolm X, Bradley was arrested for participating in an armed robbery of Livingston National Bank in Livingston, New Jersey.  Bradley

was armed with a shotgun during the robbery.  Bradley, along with a co-defendant, was charged in the United States District Court for the District of New Jersey, in a case prosecuted by the DOJ.

143.    When he appeared in court for his plea hearing, Bradley passed a note to the judge, the contents of which are unknown.

144.    Bradley's bail was initially set at $25,000, which was then reduced to $10,000. Bradley posted bail and was released from custody.  The court set no restrictions on his pre-trial release.  The court remanded Bradley's co-defendant and denied the co-defendant's later motion to set bail.

145.    Bradley's co-defendant went to trial and was convicted.  He was sentenced to 25 years in prison.

146.    The DOJ moved to dismiss the charges against Bradley.  The court granted the motion.

147.    In addition to the FBI's intelligence on Halim and Bradley, the FBI also had information about two of the other assailants: Leon Davis (the third shooter) and Wilbur Kinly (the assailant who created the diversion).

148.    As the reinvestigation revealed, eleven days after the murder, an NYPD homicide lieutenant advised the FBI that it was seeking an associate of Halim's who was known as "Turk" and "who was supposed to have been with [Halim] three weeks before Malcolm X[']s death."  The FBI's Newark Field Office immediately (and correctly) identified, but concealed, "Turk" as Leon Davis.

149.    The FBI also concealed a physical description it obtained of "the man who started the distraction by claiming someone's hand was in his pocket": "a short, dark skinned" Black man with "bushy hair and a mustache."

150.    Also among the newly discovered evidence was undercover NYPD officer Roberts's account of the murder, in which he revealed that the shooters sat in the front row of the Audubon Ballroom.  This evidence corroborated Halim's testimony and contradicted the accounts of every purported eyewitness the prosecution presented at trial.  It was also consistent with an FBI report, dated one day after the murder, which stated that the shooters were "two men, occupying the front seats, left side of [the] middle aisle."

151.    Roberts reported his observations to BOSSI, but none of the BOSSI investigators disclosed that information to any other member of law enforcement—not even within the NYPD, the agency of which BOSSI was ostensibly a component.  As a result, not even the prosecution— much less the court, the defense, or the public—knew about Roberts or what he saw on February 21, 1965.

152.    FBI Special Agent Micek, however, did know about Roberts and Roberts's account of the murder.  Micek was detailed to BOSSI, and he coordinated information on cases in which both the FBI and BOSSI were involved.  Micek concealed from prosecutors and police outside of BOSSI Roberts's identity as an undercover officer and the information that Roberts learned as an eyewitness to the murder.

153.    Numerous FBI employees obtained other information about third-party guilt, including a report that an FBI informant present in the Audubon Ballroom had identified a man (by name) "as having actually participated in the murder," although his identification was tentative. Hoover instructed the New York Field Office not to share the information with the NYPD.

154.    The newly discovered documents provided the names of specific FBI employees who were responsible for concealing the above-described information, including, but not limited to: James Adams, F.J. Baumgardner, Thomas Bishop, Charles Brennan, Cartha DeLoach, Steven

Edwards, Mark Felt, J. Edgar Hoover, Marlin Johnson, Clarence Kelley, John Malone, August Micek, D.E. Roney, Joseph Quigley, J.A. Sizoo, John Sullivan, William Sullivan, Dale R. Sutton, and William Webster.

155.    Had the previously unavailable evidence uncovered during the joint reinvestigation been revealed in 1965—or even after Halim came forward with the identities of and other information about his co-conspirators—Mr. Aziz and Mr. Islam would not have been wrongfully arrested, convicted, and imprisoned.

156.    The above-described information is not an exhaustive list of the evidence of Mr. Aziz's innocence that FBI employees possessed and long concealed.  Rather, the full extent of FBI employees' concealment of information remains to be determined and will be a subject of discovery in this case.

**F.**      **The Joint Motion to Vacate and Trial Court's Decision**

157.    Following the reinvestigation, on November 18, 2021, Mr. Aziz, Mr. Islam, and District Attorney Vance filed a joint motion to vacate Mr. Aziz's and Mr. Islam's judgments of conviction, pursuant to Section 440.10 of the New York Criminal Procedure Law (the "Joint 440 Motion" or the "Motion"), on the grounds of newly discovered evidence and failure to disclose exculpatory evidence.  The District Attorney also moved to dismiss all charges against Mr. Aziz and Mr. Islam.

158.    The Joint 440 Motion marshalled—and made public—information collected during the reinvestigation, presenting detailed factual findings and providing extensive information about the acts and omissions of FBI employees.  The Motion explicitly cited FBI employees' misconduct as one of the bases for dismissal and disclosed the nature of the intentionally withheld exculpatory information.

159.    As then-District Attorney Vance explained during a hearing on the Motion:

> [W]hat we have obtained in this reinvestigation now are new materials that our office tragically did not have in 1965 and, thus, did not turn over to the defense.  Most critically, we have obtained dozens and dozens of reports from the FBI and the NYPD Bureau of Special Services Investigations.
>
> These records include FBI reports of witnesses who failed to identify Mr. Islam and implicated other subjects and suspects, and significantly, we now have reports that the late FBI Director J. Edgar Hoover, himself, and the FBI, ordered multiple witnesses not to tell police or prosecutors that they were, in fact, FBI informants.  Many of those documents were exculpatory.  None of them were disclosed to the defense.

160.    District Attorney Vance expressly stated that "there is only one ultimate conclusion; Mr. Aziz and Mr. Islam were wrongfully convicted of this crime."

161.    The trial court granted the Joint 440 Motion at the hearing.

162.    In doing so, the state court judge who decided the Motion observed that "there can be no question that this is a case that cries out for fundamental justice."

163.    The judge continued, "I regret that this Court cannot fully undo the serious miscarriages of justice in this case and give you back the many years that were lost.  Dismissal of the indictment is the full extent of this Court's authority."

164.    The trial court vacated Mr. Aziz's and Mr. Islam's convictions, dismissed the indictment against them, and sealed the case with respect to both men.

### G.    J. Edgar Hoover's and FBI Employees' Violation of Federal Laws and Internal Directives and Operating Procedures

165.    At all times relevant to this complaint, FBI employees were required to act in accordance with federal law, as well as with mandatory internal directives and operating procedures, including, but not limited to, the following Bureau manuals: (1) the Manual of Rules and Regulations (the "MRR"), (2) the Manual of Administrative Operations and Procedures (the "MAOP"), (3) the Manual of Instructions (the "MOI"), and (4) the Manual of Investigative

Operations and Guidelines (the "MIOG").  The MRR was replaced by the MAOP in 1978.  The MOI was replaced by the MIOG in 1977.

166.    By concealing evidence of Mr. Aziz's innocence and falsely implicating him, then-Director Hoover and the other individual FBI employees, including, but not limited to, those named herein, violated federal laws and Bureau directives and operating procedures.

167.    Supervisory FBI officials knew, or reasonably should have known, that FBI employees were engaged in conduct that violated federal law and Bureau directives and operating procedures.

168.    Despite the FBI employees' violations of federal law and Bureau directives and operating procedures, supervisory FBI officials failed to discipline, terminate, or even admonish the offending FBI employees.  At best, supervisory FBI officials failed to discipline—and at worst, they rewarded—the offending FBI employees for their misconduct.

169.    As early as 1973, and continuing for all times material hereto, FBI supervisors were required to take "appropriate disciplinary action including possible dismissal" against employees who failed to "[c]onduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government" or took "any action which might [have] result[ed] in, or create[d] the appearance of . . . (c) Impeding Government efficiency or economy[,] (d) Losing complete independence or impartiality . . . [or] (f) Affecting adversely the confidence of the public in the integrity of the Government."  MRR, Part I, § 1.

170.    As early as 1963, and continuing for all times material hereto, it was mandatory that FBI supervisors "report immediately any improper conduct of employees in their territory." MRR, Part I, § 1(A)(1).

171.    As early as 1963, and continuing for all times material hereto, FBI supervisors were required to "report immediately neglect of duty or any conduct prejudicial to the best interests of the Bureau, or any matter which may result in embarrassment to the Bureau."  MRR, Part I, § 1(A)(2).

172.    As early as 1973, and continuing for all times material hereto, it was mandatory FBI policy that "employees will obey not only the letter of the law but the spirit of the law as well whether they be engaged in activities of a personal or official nature."  MRR, Part I, § 1(A)(3); *see also* MAOP, Part I, § 1-4(1).

173.    As early as 1973, and continuing for all times material hereto, it was mandatory FBI policy that "employees must at all times zealously guard and defend the rights and liberties guaranteed to all individuals by the Constitution."  MRR, Part I, § 1(A)(3); *see also* MAOP, Part I, § 1-4(2).[5]

174.    As early as 1963, and continuing for all times material hereto, FBI supervisors were required to take "drastic disciplinary action including possible dismissal" against employees who became "involved in personal misconduct which would reflect unfavorably upon the Bureau."  MRR, Part I, § 1(B)(3).

175.    As early as 1966, and continuing for all times material hereto, it was mandatory FBI policy that employees "conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government."  MRR, Part I, § 1(D)(17)(a)(1).

_____

5.  This directive was continued in the MAOP, Part I, § 1-4(2), when it was first published in 1978, and was later revised to read as follows: "[U]nder no circumstances shall employees of the FBI engage in any conduct which may result in defaming the character, reputation, integrity, or dignity of any citizen or organization of citizens of the United States."  *See* MAOP revision dated 05/15/80.  This directive was continued in the MAOP at least through February 10, 1998.

176.    As early as 1966, and continuing for all times material hereto, it was mandatory FBI policy that "no employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government."  MRR, Part I, § 1(D)(18); *see also* MAOP, Part I, § 1-2.[6]

177.    As early as 1969, and continuing for all times material hereto, it was mandatory FBI policy that "any information pertaining to allegations of misconduct or improper performance of duty coming to the attention of any Bureau employee be promptly and fully reported to the Bureau, and it is the continuing responsibility of Bureau Officials to see to it that the employees under their supervision are properly indoctrinated regarding this requirement so that they not only will fully understand it but will comply with it."  MRR, Part I, § (9)(A); *see also* MAOP, Part I, § 13-1.

178.    As early as 1969, and continuing for all times material hereto, it was mandatory FBI policy that there "be no delay in notifying the Bureau concerning any allegations of either misconduct or improper performance of duty on the part of Bureau personnel."  MRR, Part I, § (9)(B).

179.    As early as 1969, and continuing for all times material hereto, FBI supervisors were required to conduct "[i]nterviews of employees involved in allegations of misconduct or improper performance of duty . . . at the earliest logical time and in a forthright manner."  MRR, Part I, § (9)(D).

---

6.  On March 27, 1973, this directive was moved and revised to read, as follows: "§ I(1)(A)(1): Employees . . . must not, at any time, engage in criminal, dishonest, immoral or disgraceful conduct or other conduct prejudicial to the Government. . . ."  This directive was continued in the MAOP, Part I, § 1-2, when it was first published in 1978.

180.    As early as 1977, and continuing for all times material hereto, FBI supervisors were

required to impose the following disciplinary sanctions on employees who committed the listed

offenses:

> 3.  Work deficiencies and/or inattention to duty.
>
>> First Offense: Oral reprimand to removal
>> Second Offense: 5-day suspension to removal
>> Third Offense: 15-day suspension to removal
>
>> . . .
>
> 4.  Criminal, dishonest, immoral, infamous or notoriously disgraceful conduct.
>
>> First Offense: Oral reprimand to removal
>> Second Offense: 5-day suspension to removal
>> Third Offense: 30-day suspension to removal

MAOP, Part I, § 13-12.

181.    As early as 1989, and continuing for all times material hereto, it was mandatory

FBI policy that "employees shall endeavor to avoid any actions creating the appearance that they

are violating the law or the ethical standards promulgated pursuant to this order." MAOP, Part I,

§ 1(5)(n).

182.    As early as 1977, and continuing to at least 1989, it was mandatory FBI policy that

"while it is proper for the FBI to use informants in appropriate investigations, it is imperative that

special care be taken not only to minimize their use but also to ensure that individual rights are not

infringed and that the government itself does not become a violator of the law." MOI, § 108(IV).[7]

---

7.  This directive was added to the MOI in a revision dated January 12, 1977. It is unclear whether the directive was included in the MIOG when it was published in 1977; however, the directive is found in the MIOG as early as January 12, 1981 at § 137-17(A)(1). It was moved to § 137-16(A)(1) in a revision dated March 28, 1984, where it remained as late as May 26, 1989.

183.    As early as 1977, and continuing for all times material hereto, it was mandatory FBI policy that "[u]nder no circumstances shall the FBI take any action to conceal a crime by one of its informants."  MOI, § 108(IV)(C)(1); MIOG, § 137-13(1)(C)(1).[8]

184.    As early as 1963, and continuing to at least 1976, it was mandatory FBI policy that "Agents cannot promise any immunity or any reduction in sentence to a criminal who furnishes information and they must not put themselves in a position where they might subsequently be accused of having done so."  MOI, § 108(D)(4).

185.    By virtue of the FBI's relationship to the public and the mandatory directives and operating procedures set forth above, supervisory FBI officials were required to select, supervise, and retain FBI employees in accordance with such directives and operating procedures.

186.    By failing to supervise, discipline, and/or terminate the FBI employees for conduct that was illegal and violated Bureau directives and operating procedures, supervisory FBI officials violated the mandatory directives and operating procedures set forth above.

187.    The conduct of the FBI employees, as described herein, was reasonably foreseeable.  The United States' and FBI supervisors' repeated and knowing failure to discipline or otherwise dissuade in any way the FBI employees' unlawful and violative conduct, their practice of rewarding the FBI employees for such conduct, and their failure to act in accordance with the mandatory directives and operating procedures set forth above directly and proximately caused Mr. Aziz substantial harm.

188.    Despite the United States' and FBI supervisors' real or constructive knowledge of the misconduct described herein and other misconduct to be revealed during discovery by FBI

---

8.   In the MIOG, the successor to the MOI, this directive was moved over the years, but was never deleted or revised in any material way.  In a revision to the MIOG dated January 12, 1981, the directive was moved to § 137-17(G)(5).  On November 20, 1990, the directive was moved to § 137-4(5).  On March 10, 1994, it was moved to § 137-5.2(3), and the word "FBI" was changed to "field office."

employees, numerous FBI employees were permitted to engage in unlawful conduct with impunity.

189.    The repeated and knowing failure of the United States and supervisory FBI officials to discipline or otherwise dissuade in any way the FBI employees' unlawful and violative conduct, and the practice of the United States and supervisory FBI officials to reward the FBI employees for such conduct, created and fostered an agency culture in which FBI employees routinely violated federal laws and Bureau directives and operating procedures for the sake of cultivating and protecting informants in the belief that such acts would be condoned and justified by superiors.

**H.      The FBI's History of Spreading Disinformation, Withholding Exculpatory Information, and Fabricating Evidence**

190.    The FBI's mistreatment of Mr. Aziz was not a random miscarriage of justice in an otherwise functioning law enforcement regime.   Rather, during the relevant period, FBI employees, including J. Edgar Hoover and other supervisory FBI officials, engaged in a pattern and practice of knowingly, intentionally, recklessly, and/or negligently causing miscarriages of justice by causing the presentation of false evidence, concealment of evidence, and criminal prosecutions of innocent individuals.

### *1.     J. Edgar Hoover's COINTELPRO*

191.    In the 1950s, J. Edgar Hoover led the FBI to systematize a program of terror, disruption, intimidation, and instigation of violence that was aimed at infiltrating, destabilizing, and destroying groups perceived to be threats or enemies of the status quo, including, among others, the Nation of Islam, the Blank Panthers, and other Black activist organizations.

### a. *COINTELPRO Generally*

192. The FBI termed this program the "Counterintelligence Program," or "COINTELPRO." In order to maintain the secrecy of the program, however, the FBI repeatedly changed the name of COINTELPRO and its similar efforts.

193. On May 18, 1956, then-Director Hoover gave orders initiating the first officially labeled COINTELPRO operation against the Communist Party. This secret FBI initiative would expand considerably with the addition of each COINTELPRO operation from 1956 through the late 1960s.

194. COINTELPRO launched operations directed against, *inter alia*, the Socialist Workers Party, the Puerto Rican Independence Movement, the Black Liberation Movement, the New Left, the American Indian Movement, and supposed "black and white hate groups." Overall, there were twelve official COINTELPRO umbrella programs.

195. COINTELPRO included the use of so-called "investigative techniques" such as bugging, wiretapping, mail tampering, burglarizing, using undercover agents to encourage violence and disunity, and feeding false information to the public via journalists and politicians. These efforts included the use of illegal means, including: (1) concealing exculpatory information, often to conceal the activities of the FBI and its informants; (2) participating in the creation of perjured testimony; and (3) spreading disinformation to sow discord and frame innocent individuals.

196. The practice of falsely implicating individuals in criminal activity and other misconduct was so prevalent that FBI employees developed a term for it: "bad jacketing."

197. Historians agree that Hoover himself created the COINTELPRO operations, sought proposals for them, and personally authorized and monitored most of them. He prioritized

COINTELPRO projects, assigning top agents to work on them and rewarding them for doing so. Hoover himself also ensured the secrecy of the COINTELPRO operations, tightly controlling files relating to those programs to keep information about them out of the hands of the public (and even many of the Attorneys General and Presidents under whom he served).

198.    In addition to Hoover, other top FBI officials were intimately involved in overseeing the COINTELPRO programs, including William "Bill" C. Sullivan, Assistant Director of the FBI; George Moore, head of the FBI's Racial Intelligence Section; and Mark Felt, the FBI's Deputy Director and second-in-command.

199.    When Moore testified before a Senate committee in 1975, he was asked if, during the execution of COINTELPRO operations, anyone at the FBI discussed the operations' constitutionality or legality.  He responded: "No, we never gave it a thought."

### b.  COINTELPRO-Black Liberation Movement

200.    When referring specifically to its activities against Black activists and organizations, the FBI reportedly referred to its program as, among other names, the "COINTELPRO-Black Liberation Movement."

201.    Although the "COINTELPRO-Black Liberation Movement" was formally initiated in 1967, the FBI's counterintelligence efforts aimed at disrupting Black political leaders and organizations dated back decades.  For example, as early as 1919, when he was appointed the head of the FBI's General Intelligence Division (also called the "Radical Division"), Hoover engaged in efforts to destroy Black nationalist leader Marcus Garvey.  These efforts continued with surveillance of and interference with Black activist organizations and their leaders for decades to follow, including: Elijah Muhammed, who assumed leadership of what became known as the Nation of Islam in 1934; A. Philip Randolph, Black labor leader and organizer of the Brotherhood

of Sleeping Car Porters, founded in 1925; the National Association for the Advancement of Colored People; and Reverend Martin Luther King, Jr., among others.

202.    "An FBI memorandum from February 1968 described the goals of COINTELPRO as:" (1) "[p]revent a coalition of militant black nationalist groups"; (2) "[p]revent the rise of a messiah who could unify and electrify the militant nationalist movement"; (3) "[p]revent violence on the part of black nationalist groups"; (4) "[p]revent militant black nationalist groups and leaders from gaining respectability by discrediting them"; and (5) "prevent the long-range growth of militant black nationalist organizations, especially among youth." *Hampton v. Hanrahan*, 600 F.2d 600, 609 (7th Cir. 1979) (citation omitted).

203.    In short, analyses of internal FBI documents have led journalists and historians to agree that essentially any organization devoted to racial equality was a potential target for the FBI throughout most of the 20th century.  Field offices established "Racial Squads" to focus on Black organizations—no matter how respected or non-violent—and prioritized developing "Racial Informants" or "Ghetto Informants" who could report on, and interfere with, the activities of these groups.

### 2.    *Case Studies of the FBI's Misconduct*

204.    As a part of this ongoing campaign and similar campaigns against other groups perceived to be threats or enemies of the status quo, FBI employees regularly perjured themselves, knowingly provided false information and/or withheld material information from local law enforcement, allowed and/or directed the presentation of false evidence to state and federal courts, and allowed—or actively sought—the conviction of innocent people.

205.    For example, Black Panther Party (the "BPP") leader Elmer "Geronimo" Pratt, also known as Geronimo ji Jaga, spent over 25 years in prison for a murder he did not commit before

his conviction was overturned in 1997.  *See In re Pratt*, 69 Cal. App. 4th 1299, 1299 (Cal. Ct. App. 1999) (affirming trial court decision granting writ of habeas corpus).

206.    Mr. Pratt, a decorated Vietnam War veteran, was convicted and sentenced to life in prison for a 1968 murder of a schoolteacher, Caroline Olsen, during a robbery in Southern California.

207.    Before the murder, the FBI had identified Mr. Pratt as a target of its COINTELPRO efforts to destabilize the BPP and other Black activist organizations.  Indeed, historians generally agree that the FBI was likely monitoring him through illegal wiretaps and other means at the time of the murder.

208.    Throughout his trial and decades in prison, Mr. Pratt maintained his innocence and claimed that the FBI knew he was in the San Francisco area at the time of the crime.  Mr. Pratt and his legal team contended, *inter alia*, that the FBI possessed recordings from its illegal wiretapping campaign that confirmed he was not in Southern California at the time of the murder (and so could not possibly have been the perpetrator).

209.    Notably, a key witness against Mr. Pratt at trial was Julius C. "Julio" Butler, an ex-BPP member and former Los Angeles County sheriff's deputy, who claimed that Mr. Pratt had privately confessed to the murder.  Butler also explicitly denied on the witness stand that he had ever been an informant for law enforcement.  *See Pratt*, 69 Cal. App. 4th at 1304.

210.    Contrary to Butler's testimony at trial, FBI documents released years after Mr. Pratt's conviction revealed that Butler had been an FBI and Los Angeles Police Department (the "LAPD") informant for years before Mr. Pratt's trial.  *See Pratt*, 69 Cal. App. 4th at 1309-11. Butler provided information to the FBI on approximately 30 occasions, was described internally

in the LAPD as "'belong[ing]' to an FBI agent," and, at the motion of a prosecutor, had his own felony convictions reduced to misdemeanors in 1971. *Id.* at 1309, 1311.

211.   Mr. Pratt and his legal team were not informed before or during trial that Butler was a longtime FBI informant. Nor were they ever given information, or an opportunity to ask, about whether Butler provided his testimony in exchange for protection and a more favorable outcome in his own criminal cases. Indeed, the record indicates that the FBI may have concealed records regarding its involvement with Butler from the prosecution, rendering proper disclosure— and a fair trial—impossible. *Id.*

212.   Similarly, in the late 1960s, the FBI targeted Fred Hampton, a young leader in the Chicago BPP, as a perceived threat. The FBI tried to subvert Hampton's activities using its by then well-established strategies of sowing disinformation and placing a counterintelligence operative in the local BPP organization. It tapped Mr. Hampton's phone, placed him on the Bureau's "Agitator Index" as a potential threat, and focused on him as a potentially effective leader in the movement for Black liberation.

213.   Then, in December of 1969, Mr. Hampton was shot and killed in his bed during a predawn raid of his Chicago apartment by a tactical unit of the Cook County State's Attorney's Office, which received aid from the Chicago Police Department and the FBI leading up to the attack.

214.   In particular, the FBI received information about Mr. Hampton from William O'Neal, an FBI informant who had infiltrated the Chicago BPP and had become Mr. Hampton's personal bodyguard. O'Neal joined the BPP as a teenager at the urging of the FBI, which pressured him to do so based on its knowledge of O'Neal's potential involvement in an automobile theft.

O'Neal's understanding was that he would be prosecuted for this incident unless he agreed to join the BPP and pass information about its activities back to the FBI.

215.    After more than a year of passing information along to the FBI, O'Neal eventually provided FBI Agent Roy Mitchell with a floorplan of Mr. Hampton's apartment—including notes of where Mr. Hampton slept—that Agent Mitchell then passed along to the Chicago Police Department.

216.    Following the raid, the police initially claimed to have been attacked by BPP members and to have fired back only in self-defense.  That story quickly fell apart, and several Chicago police officers were indicted for conspiring to obstruct justice in connection with the coverup of the murder.

217.    Once the grand jury began hearing testimony, the FBI kept a close watch on the case, including through FBI Agent Leonard Treviranus, who served as case agent for the grand jury on behalf of the FBI.  *Hampton*, 600 F.2d at 618.  When Marlin Johnson, then-Special Agent in Charge of the FBI's Chicago Field Office, was called to testify in front of the grand jury, Agent Treviranus "sent a memorandum to FBI headquarters in Washington which assured that Johnson's testimony would not relate to 'the circumstances' of the December 4 raid, insuring that 'no exposure' to the Bureau would occur."  *Id.* at 619.

218.    Subsequently, when Agent Johnson learned that "the grand jury was interested additionally in what information the FBI had supplied to local authorities," he "asked a member of his staff to brief him," but did not speak to Agent Mitchell, even though he "knew Mitchell had provided information about the BPP to local authorities."  *Id.*  When he testified to the grand jury, he "stated that the Chicago office of the FBI was not aware that illegal weapons were in the

apartment prior to the raid" and "failed to mention that a floorplan was furnished by Mitchell to the State's Attorney's Office." *Id.*

219.    "On the same day that Johnson testified, Mitchell wrote the FBI Director on behalf of the Chicago office for authorization to continue paying O'Neal as an informant.  In the letter Mitchell justified the request . . . by reminding headquarters that O'Neal had provided a detailed floorplan of the apartment, as well as other information, which subsequently 'saved injury and possible death to police officers' participating in the December 4 raid." *Id.*

220.    Although Agent Treviranus continued to provide information and documents to the grand jury, "[c]onspicuously absent was information on the floorplan and Mitchell's December 12 memorandum concerning the presence of illegal weapons in the apartment prior to the raid." *Id.*

221.    In a subsequent civil rights suit against state and federal actors, the United States Court of Appeals for the Seventh Circuit found that "FBI documents offered by plaintiffs demonstrate that certain FBI activities directed against the BPP transcended mere 'law enforcement,' and were designed to 'neutralize' the BPP as a political voice on racial issues." *Id.* at 623-24.  Ultimately, the court held, "a reasonable jury could find that the actions of these defendants"—including FBI agents—"demonstrate that they had agreed at least tacitly to work together to eliminate the BPP." *Id.* at 624.

222.    The FBI's vendetta against the BPP continued after these murders.  In 1975, for instance, Herman Bell, Anthony "Jalil" Bottom, and Albert "Nuh" Washington, three members of the New York BPP, were convicted of the 1971 fatal shooting of NYPD patrolmen Waverly Jones and Joseph Piagentini.  By the 1980s, it became clear that the FBI and NYPD had concealed exculpatory information, including a ballistics report showing conclusively that the gun in Mr. Bell's possession at the time of arrest was not the murder weapon (contrary to testimony at trial,

40

*see Bell v. Coughlin*, 820 F. Supp. 780 (S.D.N.Y. 1993)) and the fact that a key government witness, Ruben Scott, was tortured and then offered a plea deal on a murder charge in exchange for his testimony. Scott subsequently recanted his testimony. Notwithstanding its knowledge of this evidence, at the time of trial, and during the appeals brought by each of the three men, the FBI reportedly contended it had "nothing relevant" regarding their cases.

223. Other similar incidents arose out of the FBI's use of similar tactics against Native American activists, including a group called the American Indian Movement ("AIM"). In 1973, for example, the group organized a 71-day occupation of Wounded Knee, South Dakota; subsequently, an array of federal criminal charges was brought against two of the leaders of the occupation, Dennis Banks and Russell Means. *See United States v. Banks*, 383 F. Supp. 389, 391 (D.S.D. 1974). After an eight-month trial, the court dismissed all charges against both men because of government misconduct. *Id.*

224. Particularly troubling to the court was the patently false testimony of a key government witness, Louis Moves Camp. The court noted that the government's chief prosecutor and the FBI agent in charge of the case requested that Moves Camp be administered a lie detector test before testifying—presumably because they "may have suspected that Moves Camp would give false testimony." *Id.* at 393. The request was denied by Joseph Trimbach, the FBI Special Agent in Charge of the Minnesota, North Dakota, and South Dakota Field Offices. *Id.* When Moves Camp did testify, his testimony was drastically undermined by multiple witnesses agreeing that he was in California at the time he claimed to be at Wounded Knee. *Id.* The court found his testimony incredible and observed that, if the FBI had permitted a lie detector test to be administered, "it is quite likely that Move Camp's questionable credibility would have been discovered" prior to trial. *Id.* at 394.

225.     A U.S. district court also noted what it believed "to be intentional deception of th[e] court" relating to a rape in River Walls, Wisconsin.  *Id.* at 395.  At the time, "Moves Camp was under the 'protection' of the FBI."  *Id.*  He was initially a suspect in the rape, but he "was released after FBI agents had conferred and spent several hours with the acting state prosecutor and the police officers in River Falls," informing them "that Moves Camp was to be a witness in the Wounded Knee trial."  *Id.*  When asked, the chief prosecutor told the court that he did not have any knowledge of the rape and represented that Moves Camp may have "been arrested on a public intoxication charge but not on anything 'more substantial.'"  *Id.*  Later, it was revealed that the FBI agents involved had reported the rape to their superior at the FBI, Philip Enlow, prior to this representation by the prosecutor to the court.  *Id.*  The court ultimately held the government responsible for "the prosecutor's or FBI's attempts to keep the incident secret" to protect Moves Camp and his—clearly false—testimony.  *Id.*

226.     The court also noted the false testimony of Agent Trimbach, who "made specific assurances to this court that there were no wiretaps at Wounded Knee" and "testified that he had neither seen nor signed an affidavit supporting a request for a judicial wiretap authorization." *United States v. Banks*, 374 F. Supp. 321, 334 (D.S.D. 1974).  "All these statements were untrue," but the court initially accepted "Mr. Trimbach's explanation that . . . he had forgotten both about the [tapped] phone . . . and about the wiretap authorization affidavit."  *Id.*  Later, however, the court found that, "[u]pon more mature reflection," it was "incredible that a person in Trimbach's position, and involved in a 'limelight' case could suffer from such a grievous lapse of memory." *Banks*, 383 F. Supp. at 393 n.3.  The court concluded that Special Agent in Charge Trimbach had intentionally lied in federal court, in a high-profile criminal prosecution, about evidence central to the government's case.

227. In dismissing the case, the court concluded that "[t]he fact that incidents of misconduct formed a pattern throughout the course of the trial leads me to the belief that this case was not prosecuted in good faith or in the spirit of justice." *Banks*, 383 F. Supp. at 397.

228. The FBI used similar illegal tactics against Peter Limone, Joseph Salvati, Louis Greco, and Henry Tameleo, four men who were convicted of murdering Edward Deegan in 1965. Although all four maintained their innocence, three were sentenced to death and one to life imprisonment. Two men, Mr. Greco and Mr. Tameleo, died in prison. The other two, Mr. Salvati and Mr. Limone, were released in 1997 and 2001, respectively, each after spending over 30 years imprisoned for a crime he did not commit.

229. Subsequently, the surviving men, and the estates of the deceased men, brought claims against the federal government under the FTCA. After a 22-day bench trial, Judge Nancy Gertner of the District of Massachusetts "concluded that the plaintiffs' accusations that the United States government violated the law are proved" and that "FBI officials up the line allowed their employees to break laws, violate rules and ruin lives, interrupted only with the occasional burst of applause." *Limone v. United States*, 497 F. Supp. 2d 143, 151, 153 (D. Mass. 2007).

230. Specifically, Judge Gertner found that the key witness in the government's case, Joseph "The Animal" Barboza, was a government informant who falsely identified the four men as the perpetrators of the murder and repeatedly lied under oath. Crucially, "[t]he FBI agents 'handling' Barboza . . . and their superiors—all the way up to the FBI Director—knew that Barboza would perjure himself." *Id.* at 152. "They knew this," the court determined, "because Barboza, a killer many times over, had told them so—directly and indirectly." *Id.* They also knew that his "testimony about the plaintiffs contradicted every shred of evidence in the FBI's

possession at the time," including "an illegal wiretap" planning the murder before it took place and multiple reports from other informants. *Id.*

231.    Even further, the court found that the FBI "suborned [Barboza's] perjury" when it actively developed him as a witness, encouraged him to testify despite knowing his testimony would likely be false, and took steps to ensure that he was provided with sufficient information to make his testimony appear credible in court. *Id.* FBI agents even went so far as to "vouch[] for Barboza to law enforcement and to the very jury hearing the murder case, even when all the information they had flatly contradicted his account." *Id.* at 154.

232.    After the four innocent men were convicted, the FBI continued to lie about Barboza's testimony and involvement with the FBI as Mr. Limone, Mr. Salvati, Mr. Greco, and Mr. Tameleo "appealed, filed motions for a new trial, . . . sought commutations, appeared before parole boards, s[ought] clemency from the governor, [and] even appeal[ed] to the press." *Id.* at 152.

233.    In that case, in short, the FBI "fram[ed] . . . innocent men." *Id.* at 153.  And this misconduct "was not the work of two renegade agents.  It was known to, supported by, encouraged, and facilitated by the FBI hierarchy all the way to the FBI Director." *Id.* at 191.

234.    These examples and others, including those that will be the subject of discovery in this case, evidence a pattern and practice by FBI agents and supervisory FBI officials, including Hoover, to knowingly, intentionally, recklessly, and/or negligently cause miscarriages of justice by causing the presentation of false evidence, concealment of exculpatory information, and criminal prosecutions of innocent individuals.

## DAMAGES

235.    This action seeks damages flowing from the tortious acts of Defendant's agents for the period from February 26, 1965 (the date of Mr. Aziz's arrest), through the present.  Defendant's

agents' tortious conduct caused Mr. Aziz to be unfairly tried and wrongfully convicted; to endure over 20 years of wrongful imprisonment, including the physical and mental damage arising therefrom; and to spend over 55 years bearing the burden and stigma of being falsely branded as the convicted murderer of an iconic figure in America's civil rights movement.

236.    Mr. Aziz was 26 years old at the time of his incarceration and was released in 1985 at the age of 46.

237.    Mr. Aziz served his sentence in various maximum-security prisons throughout New York State, including Attica, Sing Sing, and Clinton Correctional Facilities.

238.    His imprisonment spanned from the 1960s through the 1980s, a time period that included the Attica Uprising and well-documented inhumane treatment of prisoners.

239.    To begin his prison term, Mr. Aziz spent approximately 18 months in solitary confinement, enduring a practice that a robust scientific literature has established causes serious psychological harm.

240.    Due to his wrongful conviction and imprisonment, caused by the tortious acts and omissions of Defendant's agents, Mr. Aziz lost his chance to have meaningful relationships with his family members and friends, including his six children who were between the ages of one and ten at the time of his conviction.

241.    One of Mr. Aziz's children, in fact, was told falsely for 26 years that someone else was her father.

242.    Given the significant length of time between Mr. Aziz's release from prison in 1985 and his exoneration in 2021, his damages extend well beyond his decades of imprisonment.

243.    Mr. Aziz's conviction placed him among the most hated and notorious murderers, and he was made infamous not only by the news media, but also in the recorded history of this country—a stain, and threat, that followed him and his family for decades.

244.    The torment his family suffered exacerbated Mr. Aziz's own torment and the psychological burden he had to bear.

245.    As a direct and proximate result of the tortious acts of Defendant's agents, the injuries and damages Mr. Aziz sustained include: personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Federal Tort Claims Act
28 U.S.C. §§ 1346 and 2671–2680**

*New York State Law:
Intentional Infliction of Emotional Distress*

246.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

247.    Defendant's agents and employees engaged in a continuing pattern of extreme, outrageous, and conscience-shocking conduct directed at Mr. Aziz from at least February 21, 1965, through the vacatur of Mr. Aziz's conviction on November 18, 2021.

248.    Defendant's agents and employees' acts and omissions concerning Mr. Aziz were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

249.    Specifically, and only by way of example, Defendant's agents and employees intentionally: (1) secreted, concealed, and denied the existence of evidence exculpatory to Mr. Aziz and inculpatory to Malcolm X's actual murderers; and (2) fabricated evidence used to secure and maintain Mr. Aziz's conviction.

250.    Defendant's agents and employees engaged in that pattern of conduct with the intent of causing, or with reckless disregard for the substantial probability that it would cause, severe emotional distress to Mr. Aziz.

251.    Defendant's agents and employees' actions directly and proximately caused severe emotional distress to Mr. Aziz.

252.    While Mr. Aziz does not allege a constitutional tort in this action, the unconstitutionality of some of the acts and omissions by Defendant's employees and agents is relevant to ancillary matters of law—including, by way of non-exhaustive example, the absence of a discretionary function.

253.    By virtue of the foregoing, Defendant is liable for its agents and employees having substantially caused Mr. Aziz's wrongful conviction and resulting severe emotional distress, as well as the other grievous damages and injuries set forth above.

## SECOND CAUSE OF ACTION

### Federal Tort Claims Act
### 28 U.S.C. §§ 1346 and 2671–2680

*New York State Law:*
*Malicious Prosecution*

254.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

255.    As detailed above, Defendant's agents had a long history of misconduct that included concealing exculpatory evidence, fabricating inculpatory evidence, and assisting local law enforcement and prosecutors in the initiation of prosecutions that lacked probable cause.

256.    Defendant's agents and employees assisted in the initiation and continuation of the prosecution against Mr. Aziz without probable cause.

257.    Defendant's agents and employees, acting individually and in concert with the NYPD, with malice, and knowing that probable cause did not exist to arrest Mr. Aziz and prosecute him for the murder of Malcolm X, caused Mr. Aziz to be arrested, charged, and prosecuted for that crime.

258.    Defendant's agents assisted the NYPD's investigation of Malcolm X's murder but failed to fully disclose the facts and concealed critical evidence that would have affected the determination whether to prosecute Mr. Aziz.

259.    No person of reasonable prudence in the position of Defendants' agents would have believed that Mr. Aziz was guilty of Malcolm X's murder.  By way of non-exhaustive example and as detailed above, the FBI possessed knowledge within 24 hours of Malcolm X's murder that pointed away from Mr. Aziz and Mr. Islam being the assassins and undermined key prosecution witnesses.

260.    Defendant's agents and employees, with malice, knew or, in the absence of their deliberate and reckless indifference to the truth, should have known that probable cause did not exist to arrest and prosecute Mr. Aziz, due but not limited to the facts that: (1) they possessed and concealed evidence that was exculpatory to Mr. Aziz, and (2) they possessed and concealed evidence that inculpated Malcolm X's actual murderers.

261.    This undisclosed and concealed evidence undermined the evidence presented in support of a state grand jury's probable cause finding against Mr. Aziz.  Had the information the FBI concealed been revealed to the grand jury, it would not have indicted Mr. Aziz because, among other things, the information would have undermined the testimony of prosecution witnesses, revealed key witnesses as FBI informants, and, more generally, undermined the prosecutor's case. No grand jury fully informed of the information the FBI possessed but concealed would have found probable cause to proceed with Mr. Aziz's prosecution.

262.    Defendant's agents and employees, acting individually and in concert with the NYPD and others, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Aziz, namely, evidence indicating that Mr. Aziz was not involved in Malcolm X's murder, and evidence indicating the identities of Malcolm X's actual murderers.

263.    Defendant's agents and employees committed the foregoing tortious conduct knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Aziz's common-law right to be free from malicious prosecutions.

264.    The prosecution terminated in Mr. Aziz's favor when his conviction was vacated and the indictment against him dismissed on November 18, 2021.

265.    Mr. Aziz was, in fact, innocent of the crime for which he was convicted and incarcerated.

266.    Mr. Aziz's cause of action for malicious prosecution did not accrue until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed.

267.    As a direct and proximate result of the conduct of Defendant's agents and employees, Mr. Aziz was maliciously prosecuted, wrongly convicted, imprisoned for years, and suffered the other grievous damages and injuries set forth above.

### **THIRD CAUSE OF ACTION**

**Federal Tort Claims Act
28 U.S.C. §§ 1346 and 2671–2680**

*New York State Law:
Negligent Infliction of Emotional Distress*

268.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

269.    Defendant's agents and employees' acts and omissions concerning Mr. Aziz were extreme and outrageous, shock the conscience, and breached the duty of care they owed to Mr. Aziz.

270.    Defendant's agents and employees owed a duty of care to Mr. Aziz; specifically and by way of example, Defendant's agents created a dangerous situation for, and unreasonable risk of harm to, Mr. Aziz—incarceration in dangerous prisons, for instance—by: (1) collecting but then intentionally or negligently withholding, concealing, and denying the existence of evidence exculpatory to Mr. Aziz and inculpatory to Malcolm X's actual murderers; and (2) causing the presentation of false evidence used to secure Mr. Aziz's conviction.

271.    Defendant's agents and employees' acts and omissions breaching the duty they owed to Mr. Aziz were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

272.    Defendant's agents and employees' acts and omissions endangered Mr. Aziz's physical safety and caused Mr. Aziz to fear for his physical safety.

273.    Defendant's agents and employees committed the above-described acts and omissions concerning Mr. Aziz with the intent to cause, or with disregard to a substantial probability of causing, severe emotional distress.

274.    Defendant's agents and employees knew or should have known that withholding, concealing, and denying the existence of the material evidence described above, and causing the presentation of false evidence, would create a substantial risk of harm—namely, a substantial probability that Mr. Aziz would be wrongfully convicted and be subject to the attendant severe emotional distress.

275.    The reasonably foreseeable result of Defendant's agents and employees' acts and omissions included Mr. Aziz's wrongful conviction for a heinous crime and resulting severe emotional distress.

276.    Defendant's agents and employees' acts and omissions have caused and continue to cause severe emotional distress to Mr. Aziz in addition to the grievous damages and injuries set forth above.

## FOURTH CAUSE OF ACTION

**Federal Tort Claims Act
28 U.S.C. §§ 1346 and 2671–2680**

*New York State Law:
Negligence*

277.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

278.    Defendant is liable for the negligence of its agents and employees for having breached their duties of reasonable care to Mr. Aziz.

279.    Defendant's agents and employees owed duties of care to Mr. Aziz that required them to be forthcoming with information in their possession implicating Malcolm X's true killers and demonstrating Mr. Aziz's innocence—beginning at the time of Mr. Aziz's arrest and continuing through Mr. Aziz's exoneration.

280.    Specifically, and by way of non-exhaustive example, Defendant's agents and employees created a substantial risk of physical and emotional harm for Mr. Aziz for which a private person would be liable under New York law by actively participating in his prosecution and conviction, and the investigation that led to it, but actively concealing, hiding, secreting, and denying the existence of material information that would have tended to show Mr. Aziz was innocent of Malcolm X's assassination and reveal the identities of the actual perpetrators; and by causing the presentation of false evidence—all for the sake of furthering the aims of COINTELPRO, at Mr. Aziz's expense, for which he paid dearly, as detailed above.

281.    Defendant's agents and employees assumed a gratuitous undertaking by assisting the NYPD in its investigation into Malcolm X's murder that left Mr. Aziz in a worse position than if Defendant's agents and employees had not assumed such undertaking.

282.    If Defendant's agents and employees were private persons who had knowledge of a condition that they could eliminate and that would foreseeably cause harm to Mr. Aziz, then their failure to avoid the harm by reasonable means would constitute actionable negligence under New York law.

283.    Defendant's agents and employees took positive steps to ensure that Mr. Aziz was convicted and, once convicted, remained wrongfully convicted up until and including Mr. Aziz's exoneration.

284.    In short, private individuals in the same or similar circumstances as Defendant's agents and employees would have had a duty to disclose the material exculpatory information in their possession.

285.    In the alternative, to the extent that certain of Defendant's agents or employees may have acted outside the scope of their employment, thus bringing their tortious conduct outside the scope of the FTCA, those agents' or employees' supervisors, if private persons, would be liable under New York law for negligently supervising those agents or employees.

286.    At all relevant times, the actors who committed the tortious conduct described in this complaint were employees of Defendant and of their supervisors.  Such supervisors had the authority to supervise, instruct, punish, discipline, or terminate the employment of those actors.

287.    Such supervisors, including but not limited to then-Director Hoover, knew of the propensity of their subordinates at the FBI to commit the tortious conduct described in this complaint.

288.    Specifically, and by way of non-exhaustive example, then-Director Hoover knew or should have known that FBI employees would intentionally and actively conceal, hide, secrete,

and deny the existence of material evidence that would have tended to show Mr. Aziz was innocent of Malcolm X's assassination.

289.    Similarly, the United States Attorneys General who served during then-Director Hoover's tenure and to whom then-Director Hoover reported, knew of his propensity to engage in clandestine operations that caused, or were likely to cause, wrongful convictions such as Mr. Aziz's.

290.    Supervisory officials at the FBI and DOJ had a duty to promulgate supervisory policies, practices, and procedures that do not permit or condone misconduct, criminal activity, or constitutional violations.  They also had a duty to properly supervise their subordinates at the FBI to ensure that they did not engage in the type of tortious conduct described in this complaint.

291.    Supervisory officials at the FBI and DOJ breached their duties by failing to adequately supervise and train their inferiors within the FBI.

292.    The failures to provide adequate supervision and discipline directly and proximately caused Mr. Aziz's wrongful conviction.  Proper supervision and discipline of Defendant's agents and employees would have prevented the tortious conduct described in this complaint.

293.    Specifically, and by way of example, the supervisors' failure to supervise and discipline their inferiors at the FBI provided Defendant's agents and employees the opportunity, without realistic fear of detection or discipline, to engage in the tortious conduct described more fully above.  For instance, then-Director Hoover instructed FBI employees to conceal, hide, secrete, and deny the existence of material evidence that would have tended to show Mr. Aziz was innocent of Malcolm X's assassination.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Muhammad A. Aziz demands judgment against the above-captioned Defendant as follows:

a.  for compensatory damages in the amount of $40 million;

b.  for reasonable costs under 28 U.SC §§ 1920 and 2412(a), Federal Rule of Civil Procedure 54(d)(1), and any other applicable laws;

c.  for pre- and post-judgment interest as allowed by law; and

d.  for such other relief as this Court deems just and proper.

SHANIES LAW OFFICE LLC

Dated: November 16, 2023          By:  _____
      New York, New York              David B. Shanies
                                        Deborah I. Francois
                                        Tristan M. Ellis
                                        110 West 40th Street, Tenth Floor
                                        New York, New York 10018
                                        (212) 951-1710 (Tel)
                                        (212) 951-1350 (Fax)
                                        david@shanieslaw.com
                                        deborah@shanieslaw.com
                                        tristan@shanieslaw.com

*Attorneys for Plaintiff Muhammad A. Aziz*

55